## A. G. BURT v. THE KENTUCKY TRUST CO. BANK.

1. The "act prohibiting the circulation of foreign bank-bills of a less denomination than ten dollars," passed May 1, 1854, did not divest the ownership, or property, in such bills, nor deprive the owner of his right to maintain a suit upon them, against the bank of issue,—nor prevent him from imparting this right to a third party, by an assignment, for value.

2. The 1st, 2d, 3d, and 5th sections, all convey the idea that the illegality of the act consists in the circulation of these bills, as a substitute for money, in the ordinary commerce of the country, thereby becoming a part of the medium of exchange and barter.   Hence, the words, "*pass, transfer, and circulate,*" and "*receive, or cause to be received,*" the forbidden notes—language which must be interpreted to describe the same transaction, as including the buyer and the seller, the merchant and his customer, the banker and the broker, and the borrower on time, by discount or loan.

SPECIAL TERM.—Action to recover money on bank-bills, issued by the defendant. .

The facts appear sufficiently in the decision.

*Jones & Ware,* for plaintiff.

*Fox & French,* for defendant.

*Worthington & Matthews,* for garnishees.

STORER, J. The plaintiff is a bill-holder of the Kentucky Trust Company Bank, a corporation created by the legislature of another State, and there transacting its business, at the time the bills were issued.   The defendant objects to a recovery, by the plaintiff, upon all bills below the denomination of $10, claiming that the act to prohibit the

circulation of foreign bank-bills, passed May 1, 1854, embraces the several rights of action, and under it, we must hold, that no remedy can be given in the courts of Ohio.

The evidence in the case, establishes the following facts: The bills were, for the most part, purchased after the 1st of October, 1854, when the law referred to went into operation. Some were borrowed, but afterward paid for. They were generally bought at a large discount, and at the time of purchase, the bank had suspended, refused to redeem its notes, and had gone into liquidation.

That the bills were all received by the present holder, either to be sued upon, or returned for redemption at some future period. There is no proof that they were received to be circulated as the representatives of money, or that the plaintiff has attempted to "pass, transfer, or circulate" them; nor is it in evidence, the bills were not in actual circulation, in Ohio, when the statute took effect.

The largest amount of the bills are of the denomination of $10 and upward; of course, there can be no objection to judgment in the several cases, for the various sums represented by those notes. As to the residue of those bills, we are asked to apply the prohibition, already referred to, and it will aid, very essentially, the proper construction of the various provisions of the statute, if we, in the first place, ascertain the object of its enactment.

The title, which may be regarded as in some measure expressing the intention of the law-makers, though we admit that it does not always give a very clear indication of the purposes they contemplated, is here very plainly set forth: " An act to prohibit the circulation of foreign bank bills of a less denomination than ten dollars." The circulation, then, of such bills, was prohibited. If the bills were in circulation at the time the law took effect, they certainly might have been withdrawn and remitted for redemption, or kept on hand by the holder. They were not confiscated, as contraband, or declared of no value in the possession of the *bona fide* holder; and no such power could be claimed to

exist in the legislature. If it was lawful, before the statute operated, to circulate the notes, the person who held them, at that time, could not be deprived of his legal right to his property, nor denied his legal remedies to protect it. While thus in his hands, their value was the subject of recovery, and, if he should have lost them, by accident, or been deprived of them, by force, his action could, doubtless, be maintained as for any other species of property. But the holder had no right to aid in the circulation of the prohibited currency. The sections 1, 2, 3, and 5, all convey the idea that the illegality of the act consists in the circulation of these bills, as a substitute for money, in the ordinary commerce of the country, thereby becoming a part of the medium of exchange and barter. Hence, the words "pass, transfer, and circulate," and "receive, or cause to be received," the forbidden notes—language which must be interpreted to describe the same transactions, as including the buyer and the seller, the merchant and his customer, the banker and the broker, and the borrower on time, by discount or loan. Hence, also, the prohibition against the receiving such currency in payment of debts, to public officers, or individuals, and the declaration that all such unlawful paper shall, in the State, be held worthless; added to these, we find the penalties for the violation of the provisions of sections 1 and 2, and the closing paragraph in section 5, which avoids all discounts, whether of notes, or other securities, where the consideration was the paying out, or receiving the illegal currency. More than all, we have, in the very first section, the provisions which qualify the operation of the whole law, as to the class of holders it includes.

We think, then, that the end the statute was designed to accomplish, was, to keep out of circulation foreign bills, and thereby substitute our own, for all commercial purposes. The end sought to be thus attained, can not require a more liberal exposition of the law, and certainly ought not to demand such a construction of its provisions as would

deprive a *bona fide* holder of the foreign bill, of any legal right to dispose of his property. If the party who is in possession then, of such bills, at the time the statute took effect, could not be deprived, by any of its enactments, of his rights, and would be protected, to the full value of the notes, by all the remedies afforded by the court, he may well bring his action upon the notes themselves, in one of our courts; for the liability of the bank is perfect, and if he has a title upon which he can sustain an action, in his own name, it is difficult to conceive why he may not impart it to a third party, for value. In either case, the parties would not bring themselves within the mischief sought to be prevented, as the action of the court would be, to compel the redemption, not to aid the circulation, of the bills. Besides this, if the holder of said bills have a legal interest, which he may assert against the bank, whatever it may be, it can be subjected to the payment of his debts, by the proper process, and the value appropriated by the decree of the proper tribunal, to judicial sale,—and it can not be said that the effect of such a sale would not produce the same consequence that the transfer, by sale, of the notes, by the holder, to a third person. It can not be supposed, if the bank from which the notes issued, was solvent, and punctually redeemed its liabilities, that any question would arise under our statute; so long as they passed at full value, none of the difficulties involved in the present controversy would exist; and there would be no temptation to avoid any just responsibility. Under such circumstances, the bills would be sent home for redemption, at regular periods, dependent upon the demand for specie, and the reputation of the bank for solvency. There could be no necessity for suits in our courts, or in those of the State where the bank exists. We must regard, therefore, the condition of things presented by the evidence in these suits. The notes were not in circulation at the time they were purchased, and had not been for some weeks, their value was depreciated from thirty to forty per cent., and was

3

decreasing—the holders were in a falling market; they could not send the paper home for redemption, for that would have been a fruitless effort. Must they retain it, subject to all the contingencies of further loss, and, perhaps, at last, lose every dollar—when, by disposing of it, at its then current value, they might save a portion of their property, and thereby impart to the purchaser simply the same right they possessed themselves? We can not so under-stand the statute, nor interpret its provisions. We think we may well permit a recovery in all these actions, without doing any violence to the spirit and object of the statute.

The view we have thus taken is consistent with the former legislation of our State, on the subject of banks and banking.

For several years, statutes have been in force involving the same principles, and intended to secure the same object. The only difference between those, that existed when the present law was passed, and this law, was in the denomination of the bills prohibited—not in the mode in which the circulation of the foreign notes is forbidden.

By section 63 of the law incorporating the State Bank of Ohio, Swan 100, February 24, 1845; §§5, 6, Swan 108, previous to the passage of these statutes, the 23d section of the law passed January 28, 1824, was repealed March 23, 1840. See Swan 108, 117; law of January 22, 1846, §§1–4, and the provision in §2, Swan 111; Laws, February 24, 1848, Swan 112, §§1–3. Laws, 1845, March 12, §§1–2, expressly au-thorize suits, Laws, March 8, 1845, Swan 114; of 1851, January 25, Swan 115, as to proceedings; Laws, 1851, Swan 116, §26.

These laws were all in force, when the statute, which it is contended prohibits a recovery in these actions, was passed. They are not expressly repealed, or modified; and but for the general clause, which declares all laws inconsistent with it to be repealed, there would be no intimation how far it was intended to refer to previous statutes.

The law now in force, has a different title from any of the preceding, and though we feel bound to give it all the effect to which it is entitled, we must, nevertheless, construe it in

connection with the different statutes to which we have re-ferred, and which we find are still upon the statute book.

· If we compare the provisions in section 1, of the law of 1854, with those of section 2 of the law of 1846, and section 3 of that of 1848, we find it could not have been the object of the legislature to include, within their prohibition, cases like the present. The purpose was to prevent the circulation of foreign bills below certain denominations—not to declare them worthless, as articles of property, when not intended to be circulated, or when so depreciated in value that they could not be circulated. A different construction would operate as a legal sequestration, destroying the property of the bill-hold-er, if he attempted to convert it into its present value, and thereby forever release the foreign bank from the redemp-tion of its bills.

We can not permit such a result to follow. The institution that issued these notes, is bound to discharge them at their full value. They were valid in their original creation—they are still valid for all the purposes of collection, and as evidences of debt.

If the bank that created this currency is unable or unwilling to redeem it, we are bound to aid the holder of the bills, if he seeks, by action in our courts, to subject its property to their payment.

We shall then administer justice to all parties, and prevent a great wrong. We shall ever hold ourselves to be subject to the penal laws of our State, whenever they are clearly defined, and their meaning and object can be ascertained by those principles of exposition that we must apply to all other en-actments; claiming, at all times, that it is our duty to hold the law-makers within those limits to which the right of indi-viduals, and the constitution, must confine all legislative bod-ies. We will not presume any wrong was intended by the legislature, and we will so interpret its enactments that none shall be done. When we find a prohibition to do an act, we will not require that there should be a penalty, also, to

prevent us from enforcing a claim founded on the act forbidden.

It is our duty, in all cases, to sustain and give effect to the prohibition, by denying the remedy, but never to permit the prohibition to be extended beyond its legitimate meaning, or for a purpose that would be palpably unjust.

We have given a very careful attention to the consideration of these cases, and attentively examined the arguments of the able counsel, who have addressed us orally, and upon brief, and, on the whole case, our clear conviction is, that all the plaintiffs are entitled to judgment upon all the notes they have offered in evidence.

Judgment for plaintiff.